Shackelford, J.,
delivered the opinion of the Court.
The Chancellor in this case pronounced a decree for the complainant, in the Chancery Court at Clarksville, from which the defendant appealed to this Court. The facts necessary to be stated, are as follows: On the 13th of June, 1860, E. W. Thomas and Montgomery Davie being indebted to the Bank of Tennessee at the Branch located at Clarksville, in the sum of §25,095, by four notes for §6,273, each, payable in six, twelve, eighteen, and twenty-four months, E. W. Thomas conveyed to the President and Directors of ‘ the Bank, ten acres of land adjoining the town of Clarksville, to secure the payment of the debt. A power was reserved *178 in the deed, authorizing Thomas to lay off said land in lots, and sell the same for the payment of the debts specified. On the 7th of July, 1860, Thomas, having divided said land in lots, sold the defendant, Woodson, three of the lots at the price of $5,474.71, for which sum he executed his three notes for $1,824 each, due the 15th of April, 1861; 12th of January, 1862, and 12th of July, 1862, payable to E. W. Thomas or order, and were by him indorsed and delivered to the Bank. In September, 1861, the first note not being paid, it was placed in the hands of an Attorney for collection. In February, 1862, about the time of the fall of Fort Donaldson, the assets of the Branch Bank "of Tennessee at Clarksville, were removed by the Cashier, by the advice and consent of the President and Directors, to Chattanooga, to prevent them falling into the hands of the Federal forces; from that place, they were afterwards removed to the State of Georgia, and held by the Cashier until the close of the war. Two Of the notes thus held against the defendant were carried to Chattanooga. Woodson continued to reside in the County of Montgomery, Tenn., until the close of the war. After the removal of the assets to Chattanooga, the business of the Bank was discontinued, except the Cashier, having charge of the assets, .received payment of the notes owing by its debtors. The Cashier continued in the custody and control of the assets until they were returned to this State.
The Federal forces occupied the town of Clarksville permanently, about the first January, 1863; and from that timé until the close of the war, it was garrisoned *179 by a strong military force. In August, 1863, tbe defendant, Woodson, and E. W. Thomas, who was a resident of the town of Clarksville, procured W. P. Eindly to go to, Chattanooga, where the assets of the Bank then were. They gave him Confederate Treasury Rotes, with instructions to pay off their indebtedness to said Bank; and on the 10th day of August, 1863, the said Eindly, as the agent of the said Woodson and Thomas, paid to the Cashier of said Branch Bank, the said notes in Confederate Treasury Rotes; and he delivered to him, two of the notes, and executed a receipt against the note that had been given to an Attorney to sue upon. At the time of said payment, the Federal forces occupied and held possession of the County of Montgomery and City of Rashville, and other ■ parts of the territory of Middle Tennessee. Chattanooga was in the possession and military occupation of the Confederate forces. Upon the return of the assets of the Bank to the State, after the organization of the State government, Samuel Watson, in pursuance of law,- was appointed the assignee of the Bank, and filed this bill, to have delivered up the notes, and enforce the collection by selling the real estate upon which a lien was retained for the payment of the purchase money. Woodson in his answer admits the material allegations of the bill, and insists the payments were bona fide, and made to the proper officer; that he had the right to receive payment and deliver up the notes; and the receipt executed by him, for the note in the hands of an Attorney, was a valid payment, and brings the case within the rule settled by this Court of an executed contract.
*180 In the determination of the questions arising upon this record, it becomes necessary to look to the charter of the Bank, to see the object and purpose of its creation, the power and authority vested in its agents or officers for its control and management, and the relative status of the parties at the time of the alleged payment of the notes. The Bank of Tennessee is a public corporation, chartered for the benefit of the State. Its capital stock consisted, in part, of the Common School Fund, which the State held as Trustee, for the purpose of educating the children of the State, and the surplus revenue of the United States, deposited with the State, under An Act of Congress, approved June 23, 1836; for the re-payment of which, the faith and credit of the State stood pledged, whenever required by the Secretary of the Treasury, etc. No portion of its stock is private. It is, therefore, a public corporation, acting upon the funds and credit of the State in conformity to its charter, for the convenience and advantage of the public: Furman, Green & Co. vs. Nichol, 3 Cold., 432.
Its charter is a general public law, and all persons within the ^limits of the State are presumed to know the purpose of its creation, and the nature, character and extent of its powers. The principal Bank and Branches were located at certain points designated by An Act of the Legislature, and could only be removed by the power that located them. Its officers were Trustees, vested with limited powers to act within the scope of the authority conferred for the convenience and advantage of the public; the power of the President and Directors being limited;' and giving a rational exposition of them, it cannot be pretended they had authority to remove *181 the assets to points or places not designated by law, for purposes not contemplated by the Act of the Legislature, and not within the legitimate scope of the charter. We think, therefore, the removal of the assets of the Bank to Chattanooga was illegal, and not warranted by the provisions of the law creating the institution and locating its Branches, and is governed by the principles analogous to those settled by the Supreme Court of the United States, in the case of Minor et al. vs. The Bank of Alexandria: 1 Peters, 73. Though we think this a stronger case, for the application of the principle than that case. . It is insisted that the Legislature, by iln Act passed July, 1861, authorized the Bank to receive and pay out Confederate Treasury Notes, and therefore, the Cashier of the Bank was authorized to receive them in discharge of the debts due the Bank; and though the payment was made in Confederate Treasury Notes, it was in pursuance of existing law, and is binding on the Bank. It is unnecessary for us to consider the validity of the Act passed by the Legislature of the State on the — day of July, 1861, after the attempt of the people of the State to throw off their allegiance to the Federal Government, as the question has been definitely settled by the people of the State, acting in their sovereign capacity.
Sec. 5, of the Schedule of the Amended Constitution, provides that all laws, ordinances, and. resolutions, as well as all acts done in pursuance thereof, under the authority of the usurped State Government, after the declared independence of the State of Tennessee, on and after the 6th of May, 1861, are unconstitutional, *182 null and void, from the beginning. The constitutional amendments became a part of the Constitution of the State; and the Schedule annexed, for all purposes sought by the ratification, became equally binding on the Courts: 3 Cold., 214.
By the Schedule, the said Act was declared to have been null and void from the beginning, and it cannot be relied upon as authorizing the Cashier of the Bank to receive Confederate Treasury Notes, in discharge of the notes, so as to bind the Bank. It is insisted, though the Act is void, th'e illegal currency having been received voluntarily, and the notes delivered jip, and a receipt executed against the note in hands of the Attorney, it became an executed contract; and the case falls within the rule settled by this Court in the case of Henly et als. vs. Franklin et als., 3 Cold., 473.
The determination of this question depends upon the residence of the parties at the time the alleged payments were made, and the receipt executed against the note, and the notes delivered up at the time of the payment. The defendants resided within the territory of which the Federal forces had permanent military occupation, and had held from ’ the 1st of January, 1863, to the close of the war. The Cashier of the Bank, who received the payment at the time, was residing within the military lines of the Rebel forces, at Chattanooga. By the Act of Congress, of July 13th, 1861, all commercial intercourse was prohibited between the States declared to be in a state of insurrection and the citizens of other States, and other parts of ¡.States of the United States. It was made unlawful, and to remain unlawful *183 until sucb insurrection shall cease, or have been suppressed. The fifth section of th'e Act of July 13, 1861, providing for the collection of duties and other purposes, provided the President, by proclamation may declare the inhabitants of the States, or any section or part of them, to be in a state of insurrection against the United States. In pursuance of this Act, on the 16th of August, the President issued a proclamation, declaring the inhabitants of Virginia, North Carolina, Tennessee, and Arkansas, and other States, South of them, to be in a state of insurrection, except the inhabitants of Virginia, West of the Alleghanies, and those parts of States maintaining a loyal adhesion to the Constitution and Union, or from time to time, occupied and controlled by forces of the United States engaged in the dispersing the insurgents. The Supreme Court of the United States in the case of the Venice, 2 Wallace, 278, after quoting the Act of July 13, 1861, and the proclamation, say: “This Executive and Legislative action related mainly to trade and commercial intercourse between the inhabitants loyal and the inhabitants of the/ insurgent parts of the country; but by excepting districts occupied and controlled by National troops, from the prohibition of trade, it indicated the policy of the government not to regard such district as in actual insurrection, or their inhabitants subject to treatment as enemies. Military occupation and control to work this exception, must be actual; that is to say, not illusory, not imperfect, not transient, but substantial, complete and permanent; being such, it draws after it the full measure of protection to persons and prop *184 erty consistent -with necessary subjections to military government.”
The Federal forces having occupied and held the town of Clarksville, and territory of Montgomery County, Tennessee, from the first of January, 1868, and until the close of the war, had such permanent occupation and possession of the territory in which the defendants resided, as to bring it within the exception provided by the proclamation of the President of 16th August, 1861. And by the Act of Congress, all commercial intercourse was made unlawful with those residing within the Rebel military lines. It follows, the defendants, at the time of the alleged payment and delivery up of the notes, and the execution of the receipt against the note in the hands of an Attorney, residing within the military lines of the territory occupied and permanently held by the National forces, were prohibited from holding any commercial intercourse with the inhabitants living within the military lines of the insurgents; and the Cashier of the Bank, being at the time of the alleged payment, a resident of the insurrectionary district, the payment was unlawful, and in direct violation of the Act of Congress, and a violation of the laws of war, and is not binding on the Bank.
This case does not fall within the principles of an executed contract, as held by this Court, in the case of Henly et als. vs. Franklin et als., 3 Cold., 473.
We think there is no error in the decree of the Chancellor, and it will be affirmed.